Good morning, Your Honors. Please record my name is William Osterhout, together with Alan Kaplan. We represent the appellant, Peter Chong. If it's agreeable to the Court, I'd like to reserve a couple of minutes for rebuttal. Sure. Your Honor, Mr. Chong's case was tried, of course, as an overview of racketeering activity in the Chinese community in San Francisco in the early 1990s. And it was tried on a number of complex theories of vicarious liability, RICO, conspiracy liability, Pinkerton theories of substantive liability under the conspiracies. And we feel that in many particulars, there were evidentiary issues raised that we've raised on appeal. There were issues involving the receipt of evidence in the scope of cross-examination. But really, the case was driven, the RICO case was driven, in our view, and the sentencing of Mr. Chong by the count or by the charge in Predicate Act I of the RICO count, and counts three and four, of the indictment that he took part in a conspiracy to kill, through interstate travel, to murder Bai Ming, a gangster in Boston. It's our view the evidence is insufficient to support this on two broad grounds. First, there's no showing that he was involved in that conspiracy, as the cases have required evidence to be presented to show involvement in a 1958 conspiracy or a substantive offense. And secondly, and perhaps more importantly, in this case, no one is shown to have paid anything of value or promised consideration in consideration for traveling interstate to commit this act. And therefore, under this case decision in Ritter and the Tenth Circuit in Wickland, a new case that we've just presented to Your Honors by letter yesterday, which was Frampton in the Second Circuit, these cases, we believe, make it clear that the pecuniary element, as it's called, of Section 1958, is a very serious element that receives a strict construction. And the construction it receives is that we're talking about the rule of consideration, bargain for consideration, in a contract sense. In that sense, we submit that that never happened here, and we think the record is quite clear. As far as Mr. Chong's convolvement goes, we were favored in this case by several months of wiretaps that were played in court. Between early 1992, February, I believe, and May of 1992, the government conducted Title III surveillance of Mr. Chong's telephone and that of Raymond Chow, a witness against him at his trial. And what they uncovered was not only a great deal of drug dealing in which Chong was not convicted, but it also showed a nefarious attempt to murder the rival in Boston of Wayne Kwong. Wayne Kwong, a Boston gangster, his rival was this man, Bai Ming. And before Kwong ever alleges that he met Chong in San Francisco, in Boston, he tried to shoot Bai Ming. And he and his henchmen fled to San Francisco with a warnout. It was Wayne Kwong in the 1992 telephone conversations with Raymond Chow in San Francisco who carefully plotted two attempts on the life of Bai Ming. Both times, Chow, who was a gang leader in San Francisco and had a coterie of what they called underlings, but they were young men who had fallen under his spell, under his something like 24 years in a row. And Chow recruited these people and he did whatever he wanted. Twice he sent three men to Boston, arranged on the telephone with Kwong, to meet with Kwong, get automatic weapons, and kill Bai Ming. The first group, Kwong sent back again because they couldn't handle the weapons involved. The second group, though, was documented carefully. That was Brandon Casey, a man named Sean Hyagan, another man who also went back on that occasion, Wilson Fan. And they went to Boston. They volunteered to go. Casey testified. He was the only one of the three. Casey testified he volunteered to go because an ally named Lau, who was an ally of a higher underling to Chow, asked for volunteers for something. They didn't say what, but only that it was important to Chow. And everybody volunteered. And these men were selected. And they went back there. When they got there, they were picked up by Alan Wong, a henchman of Kwong, who took them to Kwong's house. Kwong then, either that night or the next morning, told them their mission, that they were there to kill his rival Bai Ming. He provided them with weapons, automatic weapons, made sure they could fire them, sent them over to do the deed. And fortunately, Casey, one of the volunteers, saw a policeman at the door. And he aborted it. And they flew back to San Francisco. And that was the attempt. All documented. Not a word of it concerned Peter Chong. Not only on his own phone, he didn't talk about it. The government says in its brief, well, he testified, Peter Chong did, that his lawyer told him to be careful on the telephone because the police would misuse it. But more importantly, there was nothing between Kwong and Chow, who weren't careful at all about Chong, who they called Uncle, because he was an elder person, being involved in that attempt. And so I submit, Your Honors, there's no evidence of it. The government rests for any involvement of Mr. Chong in that adventure by Kwong's testimony that when he was on the run from Boston in the late summer, early fall of 1991, he, Kwong, said that he went to a restaurant. He met up with Chow and he met Chong. And he was in a restaurant once with Chong. And he told Chong that he was having trouble in Boston with Bait Ming, which we knew because he tried to kill him already. And he said, Chong said, if he's in the way, you kicked him out, the way the translation was, or you should get rid of him if he's in the way. And that was the only thing that ever showed Peter Chong had an interest in Bait Ming, except another conversation, Kwong again testified to, that, not connected with that one, on some other occasion at a restaurant, he said that two men who identified as Loy Jai and Ray Jai came in. He overheard them speaking to Chong and saying that they almost did in Bait Ming, but Bait to do it at that time. No discussion of money. No discussion between never again did Kwong say he ever talked to Chong. Never again did he say, as a government witness, he ever talked to Chong about Bait Ming. And Raymond Chow tried to get on board that event because he had listened to Kwong testify at his own trial before he became a government witness. And he said that once he was in the Paradise Nightclub in Oakland, which he owned with Chong, and he heard at that time, specifically in that nightclub, that Chong wanted to send these men to Boston to get Bait Ming to avenge the death of a gambler named Dai Keong that Chow said was associated with Chong. And the problem with that testimony, of course, was that the nightclub, as we proved, had closed six months before the murder of Dai Keong, which was conducted by three Vietnamese gangsters. And Agent Grant of the FBI Boston testified Bait Ming was never a suspect. It was three Vietnamese gangsters who raided Dai Keong's place, killed him, escaped, and were caught. Two of them were about to go to trial when our trial conducted. So we submit that that's not enough to even hook him into the conspiracy when you compare it with cases like why we cited the Houlihan case out of the First Circuit. And I think what we see is when not only in the pecuniary element, but also when courts are construing Section 1958, they're strict in their adherence. They don't enlarge upon the Federal murder statute. And in Houlihan, you had Houlihan, the appellant in that case. He told a witness that he could have a person killed anytime he wanted. And as a matter of fact, two of them were going to go that night. Three hours later, these two men, father and son, were murdered. He was otherwise, Houlihan was otherwise involved with the group. And he was prosecuted and convicted under 1958 in the First Circuit reverse. They said that's too slender a read. Even if you assume Houlihan was talking about these two men, even if you assume he knew they were going to be followed, it was too slender a read upon which to hang a murder prosecution. And in the Fifth Circuit, in Barnett, came to a similar conclusion, where Barnett had done things that make anything, this orbital comment by Dai Chong, pale in insignificance. Barnett had to be, excuse me, the person in Barnett had actually, who was on appeal, he had actually taken the alleged assassins or the attempt to the person's house, turned out to be an FBI agent, I think. He had shown them the site. He had drawn maps. But the circuit reversed his conviction under 1958. So he wasn't shown to really know that it was a plot to murder this man. And the same is true, Sir Parker was his name. And the same is true here. There's no showing that Mr. Chong even knew what they were up to during all of the firetaps. No one implicated him. Even Chow didn't say he'd ever discussed Baik Ming with Chong. As for the pecuniary element, though, the evidence is even more bereft that anybody did that. The district court noted that at one point on cross-examination, Brandon Casey, one of the hit men who went back and couldn't accomplish this, said that he, Casey, had the question was, did Chow give you $100? Yeah, I think he did. I don't know. I think he gave me $100 in the context of their volunteerism. In other words, he had already testified he volunteered for this. And there's no showing that the $100 was a bargain for consideration or a prid quo quo for anything. Remember that Casey didn't even know why he was going to Boston, which I think is very important. And he never testified that the $100 was for commit a murder. In fact, when he was later asked on cross-examination again, and the government never approached this in this examination of any of these witnesses. But when he was asked again in cross-examination, did you get anything for the Boston trip, he said no, unequivocally. So Casey never thought he was paid. Casey never thought if he got $100 or didn't, that it was payment for a murder that he didn't know he was going to commit when he did it. And I think more importantly, you can't ignore the context of these people. Chao was an absolute guru to these young men that he had recruited. They volunteered. The testimony is clear. They did whatever he asked. They did what he thought he wanted, even when he didn't ask for it. He testified that he was the gangs in San Francisco. I, he said, I, everyone walking the street was working for me. So the idea that there was a bargain for element in the trip to Boston by those three young men is ludicrous. They were going because they were devoted to Chao, and that's the only reason they went. No one else. Yes. Mr. Chao testified at trial that, and I want to make sure I understand these facts, that Chong had sent an underling to establish a foothold in Boston. Yes. Okay. And didn't he then go on and say that when the underling was killed, Chong was angry and met with the gang leaders, the Bay Area, to take care of the matter? Yes. Okay. And according to Chao, that meant to get Bai Ming down and get him killed. I understand you may not like Mr. Chao's testimony, but wasn't that his testimony? Essentially, yes. But what I would respectfully urge is that that's the conversation that happened after the, before Bai Ming was killed, because Chao, we said Chao made this up, obviously. You know, that was the defense, Chao made that up, because he wanted to be consistent with Kwong. But he was very clear where and when it happened. It happened at the New Paradise, and no one could shake him from it, including the prosecutor. And the New Paradise closed six months before Dai Qiong was even killed. So we said, clearly, that's not credible testimony. Now, the government says, ah, but the jury must have believed it. But it's not true, because the jury had a whole lot of things. They had the evidence. They had the claim that was made by Kwong, for example, about kicked him out. They had the story of Rejai and Loyjai saying, we tried, but the barbershop. He was in the barbershop. We don't know what a jury relied on, but I don't think, with respect, Your Honor, that anyone who saw Raymond Chao testify would think that would bear the weight of that conviction. And most certainly, Your Honor, Chao didn't claim that any money was involved in this. They only claimed ñ neither did Kwong. Nobody claimed it. Now, even Casey, who went, didn't say he was paid for it, you know, and he said he got nothing for it. And if he got $100, it was clearly a gift. Did he give you anything? Give me $100. That wasn't ñ that would be a gift, because there was no bargaining here. And as the case ñ I apologize that we didn't find that until yesterday. I really do. I'm sorry. But the circuit case in the Second Circuit, which we cited Hugh Frampton, it follows Wickland in this ñ I'm sorry, Ritter in this circuit, Wickland in the Tenth Circuit about the pecuniary element of the crime. And in Frampton, the guy was promised a favor, and he was a hit man. So the favor could be construed to be a favor that it would be, you know, you'd get something of value, drugs, because it was all a drug-related thing, or you'd get money. And the Second Circuit said no. Congress is strict. This is a bargain for a matter, and it wasn't any. And I think that that was true in ñ certainly in Frampton. In the Ritter case, this case, even though Ritter was paid for a pipe bomb that he made, the court said that he was paid to make the pipe bomb and not to commit the So I think that there's been a failure of proof, Your Honors, on all counts and all reasons with respect to that count. Now, Your Honors, we've raised a number of issues. I know Your Honors have paid attention. There are evidentiary issues. There's evidentiary ñ Roberts. Yes. I did want to ñ We're familiar with the expert testimony, and I think that's ñ your time has expired, but I think those issues are covered well in your brief, and we'll give you a couple minutes for rebuttal, even though your time is up. Thank you. The only thing I would add to the overview testimony argument is the Crawford case, I think, lends substance to it. And we filed a supplemental brief or submitted a supplemental brief dealing with Crawford as well as with the sentencing issues of Blakely Booker. That hasn't been filed, but we did ñ it is submitted. And we think Crawford adds substance to that argument and gives it constitutional dimension that it was error to let Harry Hu, the sergeant, testify about the drug landscape, the gang landscape. Thank you, Your Honor. Thank you, sir. We are familiar with Crawford. I may please the Court. Good morning. I'm Brian Stretch representing the United States this morning. So let's turn to the pecuniary aspect of the case. Sure. As soon as we start where you were going. I agree with counsel. The murder for hire really is the main issues here. With respect to the pecuniary aspect, I agree that there has to be some showing of that. There was no testimony from Chong, who is the leader of this organized crime, this typical RICO enterprise, the leader, that in his discussions with his two closest associates, Chong and Kwong, there's no discussion of kill me and, by the way, pay the underlings a certain amount of money when they do it. We certainly concede there was nothing of that. But the criminal liability with respect to the murder for hire and on this prong of pecuniary gain, the government's there is certainly a conspiratorial liability. Here's an enterprise, a traditional street organized crime enterprise that has structure to it. And at the very top is Peter Chong. And when Peter Chong gives an order, that order is carried out. He doesn't participate in all the details of it. He doesn't say how one should go about killing Baik Ming. He doesn't exactly say how much money should be paid. But we do know that this is a for-profit enterprise. This is an enterprise that has a hierarchical structure. It has top lieutenants. It has soldiers. It has underlings. We know that they control, the record shows that they control the gambling dens from which protection fees have to be paid. Those who protect the gambling dens get a share of the profits from there. Those, the loan sharking is a bread and butter activity for this organization. Those who collect on those debts get a percentage of those profits. They're paid for their work. We know in certain instances, or the record shows, in certain instances, for instance, the arson on Peter Chong's house, those who are going to carry out the arson were going to be paid for carrying out that, that unlawful activity. Brandon Casey, another cooperator, testified that when he committed a robbery, he was paid out of the proceeds of that robbery for doing the event, for doing the unlawful activity at the direction of Chao. So it's within that context in which you've got an organization that has a number of members, structured members, who are being paid for their unlawful activities, whether it be loan sharking, protecting gambling dens, or in this case, killing a rival gang member, they're being paid. So when Peter Chong gives the order, take care of Baik Ming, he doesn't have to say anything else. And it's reasonably foreseeable that when he gives that order, Chao's going to carry it out, working with Kuang. The two of them will carry it out, consistent with the custom and practice of that enterprise. And when they do that, it's foreseeable that a natural consequence is that the underlings would be paid for doing it. So that's the theory of the pecuniary game. We certainly can see that there is no discussion of it, but in the context of the proof of payment. Well, with respect to the proof of payment, there are two things. One is there is proof that the question answering, and I would just refer the Court to Volume 6, 1058, which is the discussion of Brandon Casey getting money. But the question was, and did you receive anything for this trip to Boston? Yes, $100. We also note that subsequent to that. It sounds like walk-around money or, you know, it doesn't sound like a payment. It's not a very profitable enterprise if they're just giving $100. It's not very profitable, but keep in mind that they didn't succeed. Oftentimes the record shows the underlings are being paid after a successful operation. For instance, Andy Lee, who was supposed to burn down the house, that went awry. He was burned. He never got his $10,000. This was an unsuccessful attempt on Byke Mean's life. When they returned, they came back without having completed the job. So whether or not they would have gotten, if they had killed Byke Mean, returned, received payment, there's no discussion of that whatsoever. But the pattern and the practice of this organization, as exemplified in the record, is that when someone did a job and they successfully did it, they were paid. In this instance, in addition to that, there was money on the front side going out to Boston. The context, again, I know that the counsel had raised the issue of whether or not Mr. Chong really participated in it. Certainly the record reflects that Kwong and Chow, the two close associates, orchestrated the nuts and bolts of this murder scheme. No doubt about it. But when we've got this enterprise and we've got the leader, he is a man, as counsel even indicated, a few words. He didn't talk on the telephone. He was a careful man. He was a ‑‑ he's a shrewd man. And when he gave the order, he could expect it to be carried out. And in this instance, it did. And when we're looking at the record and looking at whether or not, after seven weeks of trial, a reasonable juror, a rational trier of fact, could find that Chow ‑‑ that when Chong gave the order, he could expect and assume that payment would be made, that a reasonable juror could make that finding. And then just going back with respect to the context of this time, this is an enterprise. When Wayne Kwong had come from Boston to San Francisco, this is an enterprise where Peter Chong is pulling together the different warring factions in San Francisco. So this is an order that comes from Peter Chong to his closest associates in the context of expanding their authority. They've already got control of San Francisco, and there's discussions during the fall of 1991 between Chong, Kwong, and Chow about expanding their authority and their control of the Boston. And it's in that timeframe which Chong gives the order. And it's not just the order, but later on, Wayne Kwong testifies that he is carrying out the order, carrying out the operation under the instruction of Peter Chong. And he also indicated in his testimony that he had discussed at least using underlings from San Francisco with Peter Chong and Raymond Chow, so they could get closer to the target, they could get closer to Bai Kming when they were in Boston. So it's not just an isolated comment, take him out. It's in the context of the overall expansion of this organization. It's in the context of Peter Chong already, there's testimony, having sent two individuals to Boston, at least Kwong and Chow testified that they are aware that Peter Chong had already sent two individuals to Boston to kill Bai Kming. So when we're looking at an expansion of the enterprise and the leader of the enterprise gives the order, then it is clear and direct, and certainly Kwong and Chow took it as a direct order to kill Bai Kming. I can turn my attention to the Crawford issue if I know it's not directly before the Court, but very briefly, we would just note that the objection below with respect to the expert testimony, there wasn't a specific hearsay objection, and whether or not that was preserved then for a Crawford argument here, we would suggest that it's not, and that the Court would use a plain-error analysis on that. And then the other issue with respect to the expert testimony is that the expert did not testify to conclusions that Peter Chong was the leader or whoever was in the actual organization. All the testimony by the expert was to lay the existence of organizations, and then there were six cooperators who came and testified throughout the seven-week trial, who laid out the structure of this enterprise, laid out the structure of the organization, who was in charge. And so, and those individuals obviously were subject to cross-examination as to who was leadership, who was second in command, and who had the underlings. So overall, we would suggest that even if the Court does apply a harmless error standard, that it's harmless error beyond a reasonable doubt, given the level of testimony of the other cooperators who were subject to cross-examination. Any further questions? Thank you, counsel. Thank you, Your Honor. With respect to the latter points, Your Honor, the six cooperators didn't testify about the woe-hot-toe primacy that the agent, that Harry Hu did, the police officer. So his was really the only testimony that put that gang landscape in place that the government relied upon, even though he did not mention under the Court's direction names of people who were the head of these things. He did echo the government's opening statement, and we think that that was error. I believe there was a hearsay objection included within our objection to that testimony, and I think it's preserved, and Crawford enlarges upon it. With respect, Your Honor, to the testimony about, I don't believe that it's clear that Peter Chong gave an order at all. I don't think if you read what Wayne Kwong said that it can be translated as an order, or that he needed an order, because Kwong had already attempted to kill Bike Ming, who was his rival. When Brandon Casey was back there to try to do it on Chow's orders, he was told by Kwong that when Bike Ming was out of the way, he, Kwong, and Chow would divide Boston's Chinatown between them. There was no mention of any room for Chong in there, and there was no showing that they were acting on his orders at all. I think that, I mean, we can take liberties with evidence, or we can read too much into it, but I think it's much too much to say that Mr. Chong gave any order at all. The argument that there's an enterprise, and the enterprise involved paying people for various illegal things, I think was rejected by the various courts, this Court in Ritter, Wicklund, and a Second Circuit more recently in Frampton. That's not the way we assess the pecuniary element of 1958. It isn't. You can't just say, well, people are normally paid, and he could expect something. There has to be a bargain for consideration now in this case, with this trip specifically, to kill this victim. And that was totally and utterly lacking. Thank you, Counsel. Thank you. The case is here to be submitted, and we will take a ten-minute recess.
judges: Thomas, Fisher, Robart